UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| --------------------------------------------------------------------------X | | Civ. Action No.: |
| | : | 14-CV-3493 |
| ADNAN AWADALLAH, | : | (RRM) (VMS) |
| | : | |
| Plaintiff, | : | |
| -against- | : | **SECOND** |
| | : | **AMENDED** |
| THE WESTERN UNION COMPANY, FIRST DATA | : | **COMPLAINT** |
| CORPORATION, DAVID L. SCHLAPBACH, ROBERT | : | |
| GEORGE DEGEN, KIM CATHERINE HEAVEY, | : | |
| CHARLES T. FOTE and MICHAEL T. WHEALY, | : | |
| | : | |
| Defendants. | : | **JURY TRIAL** |
| --------------------------------------------------------------------------X | | **DEMANDED** |

Plaintiff Adnan Awadallah ("Plaintiff" or "Awadallah"), by and through his
attorney, John F. Schutty of The Law Office of John F. Schutty, P.C., complaining of the
Defendants, respectfully alleges:

## JURISDICTION & VENUE

1.      This action arises under certain laws of the United States, including the
Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C.
§ 1350, and various state laws.

2.      This Court has "federal question" jurisdiction over this action under 28
U.S.C. § 1331 based on the applicability of federal law, and "diversity jurisdiction" under
28 U.S.C. § 1332(a)(2) because this action concerns "citizens of different States" and a
"subject of a foreign state" (the Defendant corporations are domiciled in Colorado and
Georgia, the individual defendants are believed to be citizens and residents of various
states, and Plaintiff is a citizen of the State of Israel).

3.      This Court has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 U.S.C § 1367.

4.      Many of the acts, decisions and transactions constituting the wrongs alleged herein occurred within the confines of the United States District Courts for the Southern and Eastern Districts of New York.  In addition, the Defendants reside, are found, have agents, or transact certain affairs within the Eastern District of New York. Venue is, therefore, proper in the Eastern District pursuant to 28 U.S.C. § 1391.  Personal jurisdiction exists over the non-resident individual Defendants under the New York State long-arm statute, N.Y.Civ.Prac.Law Sec. 302(a)(2).

## THE PARTIES

5.      Plaintiff, at the time of the acts alleged herein, was a Palestinian citizen of the State of Israel and was then maintaining a residence in Spain.  He presently resides at Largo Olgiata 15, Isola 5, Rome 00123, Italy.

6.      At all times referred to herein, Defendant The Western Union Company ("WU") provided money movement and payment services worldwide.  WU was incorporated in Delaware as a wholly-owned subsidiary of Defendant First Data Corporation on February 17, 2006, and on September 29, 2006, First Data Corporation distributed all of its money transfer and consumer payments businesses and its interest in a WU money transfer agent, as well as its related assets, including real estate, through a tax-free distribution to First Data Corporation shareholders.  WU is headquartered in Englewood, Colorado, and it has been doing business in the State and City of New York at all times described herein.

7.      At all times referred to herein, Defendant First Data Corporation ("FDC") was a global payment processing company headquartered in Atlanta, Georgia. FDC was incorporated in Delaware in 1989, and it has been doing business in the State and City of New York at all times described herein.

8.      At all times referred to herein, David L. Schlapbach ("Schlapbach") was employed by Defendant WU as its General Counsel and he was residing in New York City. He was one of the most senior officials and policy makers at WU during the events discussed herein.

9.      At all times referred to herein, Robert George Degen ("Degen") and Kim Catherine Heavey ("Heavey") were Vice Presidents within the Security Department at FDC; they were senior executives within FDC and they conspired with Schlapbach, *et al*., (and each other) to harm Plaintiff.

10.      At all times referred to herein, Charles T. Fote ("Fote") was employed by Defendant FDC as its Chief Executive Officer. He was the most senior official and policy maker at FDC during the events discussed herein, and, upon information and belief, he supervised and conspired with Schlapbach and either authorized Schlapbach's wrongful actions against Plaintiff or expressly ordered that those actions be taken (he conspired with Schlapbach, *et al.,* to harm Plaintiff).

11.      At all times referred to herein, Michael T. Whealy, Esq. ("Whealy") was employed by Defendant FDC as its General Counsel. He was one of the most senior officials and policy makers at FDC during the events discussed herein and he coordinated with and conspired with Schlapbach, *et al.,* to harm Plaintiff.

12.    At all times referred to herein, Schlapbach, Degen, Heavey, Fote and Whealy, and various John/Jane Does, individually and in their official capacities as servants, agents and/or representatives of FDC or WU, conspired with each other and were involved in acts and/or omissions relating to the false arrest, abuse of process, malicious prosecution, torture, and imprisonment of Plaintiff.  Upon information and belief, Schlapbach, Degen, Heavey, Fote and Whealy, and the various John/Jane Does who participated in the conspiracy to have Awadallah arrested in Italy are American residents and their conspiratorial plan was hatched in the United States and all of the documents used to further the conspiracy (*e.g.*, emails, memoranda, transcripts and recordings) are within the United States.

13.    Upon information and belief, and at all relevant times, Schlapbach, Degen, Heavey, Fote, Whealy and various John/Jane Does, individually and in their official capacities as servants, agents and/or representatives of FDC or WU, acted at all times within the scope of their employment for Defendants FDC and WU.  Alternatively, Schlapbach, Degen, Heavey, Fote and Whealy, and various John/Jane Does, acted outside the scope of their employment in harming Plaintiff, but WU and FDC have failed to deny that the actions of the latter individuals were wrongful and WU and FDC have, thereby, adopted such actions as their own.

## INTRODUCTION TO THE CLAIM

14.    Plaintiff was wrongfully arrested, prosecuted and incarcerated in Rome, Italy (and Germany) between March 2004 and November 17, 2013; civil proceedings also were wrongfully brought against Plaintiff in Jerusalem, Israel and London, England with a malicious intent.  These litigation events all arose out of a conspiracy entered into

-4-

by the Defendants in the United States to obtain one goal -- to silence Plaintiff and prevent him from disclosing WU's and FDC's wrongful conduct.

15.     After nine long years, Awadallah was finally exonerated of an aggravated extortion charge that was wrongfully initiated by employees, agents and representatives of Defendants WU and FDC (*viz.*, Schlapbach, Degen, Heavey, Fote and Whealy) when an appellate opinion and Judgment was issued by the Court of Appeals of Rome – 2nd Criminal Section.  *See* attached English translations of July 4, 2013 Judgments of the Court of Appeals of Rome - 2nd Criminal Section – hereinafter "Oral Judgment" (read out in court on 7/4/13) (Exhibit A hereto), "Written Judgment" (filed August 2, 2013) (Exhibit B hereto), and "Court Abstract" confirming that the Judgment exonerating Awadallah became "final" on November 17, 2013 (Exhibit C hereto).

16.     The 2004 aggravated extortion charge brought in Rome, Italy was instigated and initiated by an "entrapment meeting" scheduled purposely by the American Defendants in a foreign jurisdiction (Rome, Italy was randomly selected) where the Defendants might assert an influence over police and prosecutors; in an Italian criminal court, a false criminal complaint was filed, misinformation was passed along to police and prosecutors, documents were promised but not delivered to the Italian authorities, and false testimony was supplied by WU/FDC employees (Schlapbach, Degen and Heavey); all of this conduct was authorized or ordered by Fote and Whealy. What was a long-standing civil dispute between Awadallah and WU/FDC was wrongly transformed by WU's and FDC's American agents and employees into a fabricated criminal complaint in an otherwise disinterested foreign jurisdiction where no act, other than the March 11, 2004 meeting staged by the Defendants, occurred.  In short, the Italian

criminal charge was used improperly to silence Awadallah about discriminatory currency exchange practices and other misconduct that had been committed by WU and FDC outside of Italy.

17.     The March 11 meeting was dramatically staged in an effort to produce an Italian extortion charge, and the criminal proceedings ultimately instigated by the Defendants in Italy, resulted in Awadallah's arrest, an imprisonment (followed by a house arrest in Rome), a trial and an unjust conviction (with a five year prison sentence). In all, the criminal proceedings from arrest to exoneration (and other wrongful legal proceedings) took nearly ten years of Awadallah's life away from him.  When he was finally exonerated of the aggravated extortion charge, the Italian Court of Appeals specifically found that Awadallah should be acquitted "in the broadest terms conceivable" because the Defendants, including WU/FDC, had submitted "no reliable evidence at all" of any extortion in Italy (which can only be shown by "a demand not accompanied by a reasonable intent to assert an actionable claim in court").  The Italian Court of Appeals concluded that Awadallah should be acquitted "of the [extortion] charge ascribed to him *on the grounds that the offences never actually occurred*" (emphasis added).  Judgment at 10.

## THE FACTS

18.     Adnan Awadallah, age 53 (date of birth: October 3, 1961), was born and raised in Israel.  For many years, he worked with his father as a travel agent.  Among other things, Awadallah transferred money and assisted clients in transferring their money around the world, and he regularly employed the services of WU (a company that was for a time owned and controlled by FDC) to perform the latter task.

### A.  Awadallah's Business Relationship with WU

19.      For a number of years prior to 1999, Awadallah estimates that he used the services of WU thousands of times to transfer money (millions of dollars) – these transfers were made sometimes in his name and often in the names of various third-parties.  Very often, Awadallah's money transfers involved a currency exchange (*e.g.*, pounds to dollars, or shekels to pounds, or *vice versa*).

20.      In or around July 1999, Awadallah discovered that WU was applying very different exchange rates to customers effecting money transfers on the very same day (customers in certain regions or countries were being charged less favorable exchange rates than other customers in other locations).

21.      In the years that followed (1999 – 2004), Awadallah entered into two *separate*, ongoing dispute negotiations with WU/FDC.  *First*, a dispute developed over how much money he had been improperly charged when a currency exchange rate had been applied to his WU money transfers.  *Later*, a civil dispute developed over how much money he should be paid for: (a) an admitted 2003 glitch in FDC's American security system that caused thousands of automated, non-stop telephone calls to be made to Awadallah's home and cell phones for more than a month (these non-stop phone calls literally took away Awadallah's ability to receive or make any other phone calls and cost him substantial money in "roaming" charges), and (b) other harassing threats made against Awadallah by FDC personnel.  These disputes were the basis for Awadallah's frequent telephone calls with WU and FDC personnel.

### B.  1999: An Economic Dispute Develops Over Currency Exchange Rates Applied by WU

22.     Awadallah first brought WU's discriminatory, currency exchange irregularities to the attention of an agent within a WU customer service center in St. Louis, Missouri in July 1999.  Eventually, he spoke several times with Ms. Carol Brown, a WU manager within the latter service center, who admitted that there appeared to be "irregularities" in the currency exchange rates that Awadallah had been charged on many of his transactions.  Awadallah had transferred money, among other places, between Spain/Israel, Spain/Palestine, UK/Israel, and UK/Palestine.  He noticed that WU was providing a less favorable currency exchange rate to and from the area controlled by the Palestinian Authority than the rate applied to transfers to and from Israel (and certain other countries when a currency exchange was involved).

23.     On July 26, 1999, WU's then General Counsel, David L. Schlapbach (an attorney residing in New York) called Awadallah and advised that he was taking over the investigation of Awadallah's currency exchange claims -- Schlapbach transferred $1,500 immediately to Awadallah accompanied by the message "excess damage."  After investigating the transactions described by Awadallah (and after Awadallah supplied records detailing many of his money transfers), Schlapbach ultimately admitted that Awadallah was owed money because of the "currency exchange irregularities."  [Mr. Michael Luchinsky (another American employee of WU), who was responsible for the setting of WU's exchange rates at the time, also admitted to Awadallah that there were irregularities in the currency exchange rates being applied by WU.][1]

---

[1]     Awadallah's currency exchange rate complaints had merit and it is now clear why WU wanted to silence him – because ultimately WU's currency exchange rate wrongdoing caused the company to pay out a large sum of money to many other people.  *See In re Western Union Money Transfer Litigation*, Master File No. CV-01-0335 (CPS) (E.D.N.Y.).  In the latter 2001 litigation, *filed two years after Awadallah first complained about WU's behavior,* a worldwide settlement was achieved in a civil RICO and consumer protection class action brought on behalf of

24.     Schlapbach began by evaluating forty-four 1999 transfer transactions identified by Awadallah.   He later advised Awadallah that he was continuing to investigate Awadallah's money transfers and that his investigation was "ongoing." Schlapbach never shared his investigation results with Awadallah and Schlapbach never showed how he was going to calculate what Awadallah might be owed by WU.  Instead, Schlapbach began paying Awadallah sums of money to resolve the dispute, from the New York metropolitan area, *without ever supplying records or proof that Awadallah's claim was being resolved through any precise mathematical calculation*:

➢ July 27, 1999:  Schlapbach called and provided Awadallah with an MTCN for $1,500.
➢ Aug. 02, 1999:  Schlapbach pays Awadallah $13,000, with an accompanying message ("excess damage").
➢ Aug. 13, 1999:  Schlapbach pays Awadallah another $35,500 (first settlement agreement is signed for the first $50,000 paid). [2]
➢ Aug, 24, 1999:  Schlapbach pays Awadallah $12,000 for phone expenses.
➢ Aug. 31, 1999:  Schlapbach pays Awadallah $15,000 (no agreement signed).
➢ Sept. 09, 1999:  Schlapbach pays Awadallah $17,000 (no agreement signed).
➢ Sept. 13, 1999:  Schlapbach pays Awadallah $8,000 (no agreement signed).
➢ Sept. 15, 1999:  Schlapbach enters into agreement with Awadallah and pays him $82,500 (money paid into bank account in Spain).
➢ Oct. 15, 1999:  Schlapbach pays Awadallah $25,000 (money paid into bank account in Spain).
➢ Nov. 29, 1999:  Schlapbach enters into agreement with Awadallah and pays him $30,000.

25.     After these initial payments, and the signing of agreements dispatched from the New York metropolitan area, Awadallah was paid additional sums of money by

---

approximately 18 million people who used Western Union's money transfer services to transfer money from one country to another.  Senior U.S. District Judge Charles Sifton noted that the team of plaintiffs' counsel had "secured a significant recovery, including injunctive relief that requires [WU] to materially change the consumer disclosure forms and receipts that it uses throughout the world."  *In re Western Union Money Transfer Litigation*, Master File No. CV-01-0335 (CPS) (E.D.N.Y. Feb. 8, 2005) (Memorandum and Order, at 13, 16).

[2]     A settlement agreement, which was expressly to be governed by New York law, was proposed to Awadallah for this payment.  While this agreement stated that Awadallah could

WU and FDC, and additional agreements were proposed and/or signed *stating explicitly*

*that New York law would apply to any dispute arising out of the agreements.*

➢ Jan. 27, 2000:  Degen sends Awadallah $5,000 through WU.
➢ Aug. 28, 2000:  Charles Fote, the then Chief Operating Officer (later CEO) of FDC, provides Awadallah with details of an offer of settlement and he wires the first $5,000 payment to Awadallah in Germany.
➢ Aug. 31, 2000:  Second payment of $5,000 wired to Awadallah in Germany.  All subsequent payments under the Fote agreement were accompanied by the message: "PARTIAL SETTLEMENT FOR D. SCHLAPBACH P/C FOTE" (Degen takes over subsequent 14 payments of $7,850)
➢ Sept. 11, 2000: $7,850 wired to Awadallah.
➢ Sep. 28, 2000: $7,850 wired to Awadallah.
➢ Nov. 2000:  $7,850 wired to Awadallah.
➢ Dec. 2000:  $7,850 wired to Awadallah.
➢ Jan. 2001:   $7,850 wired to Awadallah.
➢ Feb. 2001:  $7,850 wired to Awadallah.
➢ Mar. 2001:  $7,850 wired to Awadallah.
➢ Apr. 2001:  $7,850 wired to Awadallah.  In addition, four more payments of $7,850 each were accelerated by Degen at Awadallah's request.
➢ Apr. 19, 2001: Agreement to pay $100,000 is proposed ($15,000 to be immediately paid and 85,000 to be paid after five years).
➢ Apr. 23, 2001: Awadallah refused to accept and sign the proposed agreement faxed by Degen.
➢ Jun. 01, 2001:  $40,000 paid to Awadallah by order of Fote.
➢ Oct. 08, 2001:  $5,000 paid to Awadallah by order of Fote.
➢ Nov. 19, 2001: $120,000 agreement proposed to Awadallah (negotiations on the terms of payment start between Awadallah, his uncle (Prof. Hani Awadallah in New Jersey), and Degen/Ritter, the latter person was a colleague of Degen's at FDC).
➢ Nov. 21, 2001: $8,000 paid to Awadallah (under Nov. 19 agreement).
➢ Dec. 05, 2001: Awadallah signs the terms of the Nov. 19 agreement and sends it to FDC and FDC makes a payment of $ 28,000 to Awadallah, in addition to paying $2,000 to his uncle in New Jersey.
➢ Dec. 17, 2001:  Awadallah receives a letter of commitment and a guarantee from the General Counsel of FDC, Michael Whealy, and $1,500 is sent to Awadallah to cover expenses for a meeting in Paris.
➢ Dec. 20, 2001:  Meeting in Paris with Awadallah and Degen and Ritter.  Awadallah is paid $10,000 in cash, $15,000 through WU, and an additional $ 5,000 is wired to his uncle in New Jersey
➢ Jan.  2002:  Awadallah receives a check for $1,667 through his uncle in NJ.
➢ Feb. 2002:  Awadallah receives a check for $1,667 through his uncle in NJ.

---

confer with a lawyer, Schlapbach told Awadallah that he needed to sign it and return it immediately.

➢ Feb. 2002: Awadallah asks that the unpaid balance of $48,674 (of $120,000) be paid on an expedited schedule.
➢ Feb. 25, 2002: FDC attorney, Karim G. Kaspar (Lowenstein Sandler – New Jersey), sends a letter to Awadallah's uncle, stopping any further payments.
➢ May 24, 2002: Attorney Kaspar informs Awadallah that FDC's General Counsel, Whealy, will pay the balance of what is owed to him ($48,666) on the following schedule: $30,666 now and the balance of $18,000 in twelve monthly payments, all subject to the signing of a consent to a judgment by Awadallah and his uncle.
➢ May 28, 2002:  Attorney Kaspar prepares papers for Awadallah's uncle to sign in New Jersey.
➢ May 31, 2002:  Attorney Kaspar gives Awadallah $10,000.
➢ June - July 2002: Attorney Kaspar fulfills immediate payments in accordance with the signed final agreement.
➢ July - Nov 2002: Attorney Kaspar pays Awadallah monthly payments of $1,500 accelerated through November 2002.

26.    As to the last few accelerated payments, Attorney Kaspar had Awadallah sign a final agreement (in June 2002) – with the same amount promised to Awadallah previously by Messrs. Degen, Ritter and Whealy – the only change was that the payments were accelerated <u>and</u> FDC was supposed to release the liens imposed on Awadallah's bank accounts in Jerusalem (this latter promise was not honored by FDC/Fote).

**C. May 23, 2003: Awadallah Suddenly Begins to Receive Thousands of Automated Calls from an FDC Computer in the U.S.A.**

27.    On or about May 23, 2003, Awadallah began to receive thousands of calls on his telephone lines (home and several cell phones) from an FDC computer located in the United States.  These computer-generated calls continued to ring Plaintiff's phones, unabated, for more than a month.  Awadallah sustained thousands of dollars in phone bills (roaming charges) as a result and he literally had to change his telephone numbers to avoid receiving further calls.

28.    In early June 2003, Awadallah contacted one of FDC's attorneys in New Jersey, Karim Kaspar (and later, Whealy), about this serious problem.  On June 10, 2003, Whealy paid Awadallah 5,000 Euros; the money was paid through attorney Kaspar under

a release (in English) signed by Awadallah.  On June 19, when the harassing calls continued, Awadallah again called attorney Kaspar and Whealy for relief; Whealy promised and paid additional money to compensate for the resulting damage (once more, through Kaspar).

29.     Ultimately, FDC admitted that a "glitch" in its American computer (security) system caused the harassing phone calls to Awadallah, but FDC refused to assure him that the phone calls would stop or that he was not a "target" of FDC. Awadallah repeatedly requested assurances from FDC that the harassing phone calls from America were not intentional retaliation against him for seeking relief on his currency exchange claim.  In fact, Awadallah never received a definitive statement from FDC as to whether the phone calls were an intentional retaliation or not.

30.     By late June 2003, with the harassing calls continuing, Awadallah started living in fear of his life; he telephoned Fote in Denver, Colorado, the then-CEO of FDC, seeking his intervention.  Awadallah talked, almost daily, with attorney Kaspar (in New Jersey), and exchanged emails with him.  Kaspar was fully aware of the problem and Awadallah's fears.  Awadallah later contacted Fote, who personally promised Awadallah that the problem would be resolved.

31.     On August 4, 2003, Awadallah suddenly experienced a new position taken by Fote: Fote advised Awadallah that, after talking to Whealy, Fote wanted to finance a $2 million investigation into Awadallah's life, employing the services of two United States agencies – the Federal Bureau of Investigation ("FBI") and the Central Intelligence

Agency ("CIA")[3] -- to ruin and finish Awadallah.  Fote and Whealy admittedly had begun a campaign to hurt Awadallah.  Awadallah tried to call Fote the next day without success.  On August 6, Awadallah received an anonymous email threat, which emanated from the United States.

32.     For the rest of 2003 and early 2004, Awadallah's damage claim for the harassing phone calls remained unresolved.  Awadallah continued to call Kaspar, Fote and Whealy seeking assurances that he would no longer be targeted by FDC and its American security people.  In early February (February 9 -10), the threats against Awadallah by Fote were renewed, with even greater vigor.  Fote directly and explicitly advised Awadallah (among various other insults) that he wanted to kill Awadallah, and that his son and father also wanted to kill him.

33.     Upon information and belief, sometime in early 2004, Fote, Whealy, Schalapbach, Degen and Heavey conspired and developed a strategy to harm Plaintiff by setting up a meeting in Rome, Italy, to entrap Plaintiff by suggesting that he accept money under certain false pretenses suggested by the Defendants (they conspired to videotape the meeting and turn the tape over to Italian authorities).   Upon further information and belief, Fote, Whealy, Schalapbach, Degen and Heavey determined that Rome was the most appropriate foreign jurisdiction to bring a criminal charge because of their considerable influence in that city over Italian prosecutors and police officers.  The entrapment meeting might have been staged anywhere, but the Defendants purposely chose Rome, where no prior events had occurred.  On February 27, 2004, Heavey

---

[3]     Following the events of September 11, 2001, the Federal Bureau of Investigation and Central Intelligence Agency both developed a very strong relationship with the executives of WU and FDC.  *See generally* R. Suskind, The One Percent Doctrine (2006).

telephoned Awadallah from Denver, Colorado (she only introduced herself as "Kim," a personal assistant to Fote). During that call, Heavey stated that Fote wanted to settle FDC's dispute with Awadallah over the harassing phone calls through the payment of a sum of money in Italy; she also promised that Awadallah would no longer be a target of FDC (or Fote). A total settlement of 100,000 Euros was promised to Plaintiff by Heavey/FDC on February 27, 2004. That very same day, Heavey sent two payments of $2,500 to Awadallah (in Rome) through WU. On March 5, 2004, Heavey called Awadallah again, and again she sent him two payments of $2,500 through WU. Heavey advised Awadallah that she would be traveling next week to Rome to meet with him and complete their settlement talks. In subsequent communications with Fote's assistants, Awadallah was asked to provide his bank account details for the balance of the money to be wired to him. Awadallah answered that it would be satisfactory to meet with Heavey first, and the money could be wired later, because his primary desire was to obtain some written assurance that FDC would stop threatening to harm him (not a sum of money).

34.     On March 10, 2004, Heavey called and advised Awadallah that she was in Rome and she would call him the next day to formalize plans for their meeting. Heavey advised Awadallah repeatedly that she was acting on behalf of Fote, Whealy and Schlapbach.[4]   The suggested meeting with Plaintiff (and the trap attempted by WU's/FDC's security personnel and attorneys) is discussed in greater detail below. It is important to note here that, while it is admitted that Awadallah made many telephone

---

[4]   Fote, the then Chairman and Chief Executive Officer of FDC called Plaintiff personally on his mobile phone and, following a long conversation, Fote asked Plaintiff to meet his personal assistant named "Kim" in Rome and to accept the payment that Kim would give him. During the course of that same day, Whealy, the then General Counsel and Chief Administrative Officer of FDC, telephoned Plaintiff and sent Plaintiff an e-mail confirming the assurances given by Fote and Whealy personally vouched for Plaintiff's safety at the March 11 meeting.

-14-

calls to WU personnel to obtain: (1) satisfaction on his currency exchange claims and (2) assurances that FDC would not continue to threaten him and target him (along with satisfaction for the harassing telephone calls made to his phones), these were all telephone calls made by Awadallah in seeking to obtain reasonable assurance and *economic* satisfaction – in short, *all of his demands were accompanied by a reasonable intent to assert an actionable claim in court (something that fully legitimized Awadallah's actions and set them far apart from a claimed "aggravated extortion").*

### D.    WU Elects to Take Offensive & Improper Action Against Awadallah

35.    In or around or after December, 1999, agents, servant or representatives of WU/FDC in America (Schlapbach, Degen, Heavey, Fote and Whealy, and various John/Jane Does) formulated and initiated a three-prong, conspiratorial attack to silence Awadallah – by commencing legal proceedings against him in three, separate, foreign countries.

36.    *First*, lawyers for WU/FDC filed an *ex parte* legal action against Awadallah in Jerusalem where they sought and obtained: (a) liens and a freeze on all his bank accounts in Israel, and (b) an injunction forbidding him from contacting WU.  These lawyers also sought, but were denied, a financial judgment against Awadallah.  Upon information and belief, Schlapbach engineered this effort from the New York metropolitan area and signed at least two affidavits at the Israeli Consulate in New York City to further this course of action.  Upon information and belief, Fote and Whealy authorized or ordered this action by Schlapbach.

37.    *Second*, lawyers for WU/FDC filed an *ex parte* legal action against Awadallah in London and sought and obtained: (a) an injunction forbidding him from

contacting WU, and (b) an arrest warrant for breach of court orders, based on false and fabricated evidence.  Awadallah claims that he never received any of the original paperwork filed against him in London.  Again, upon information and belief, Schlapbach engineered this effort from the New York metropolitan area and, upon further information and belief, Fote and Whealy authorized or ordered this action by Schlapbach.

38.     *Third*, another attack against Awadallah was initiated when FDC's lawyers and private investigators, together with high-profile Italian attorneys and police officers, set up a complex scheme in early 2004 to convince Italian prosecutors to bring a criminal extortion charge against Awadallah in Rome, Italy.  This criminal charge would, supposedly, be supported *only* by a meeting with Awadallah in Rome, where Awadallah would be handed a check for money allegedly extorted from WU/FDC by Awadallah.  Again, upon information and belief, Schlapbach engineered and coordinated this effort from the New York metropolitan area and used a Citibank-New York check (and the services of Degen and Heavey) to set up the criminal charge.  Upon information and belief, Fote and Whealy authorized or ordered this action by Schlapbach, Degen and Heavey from their offices in America, and Fote and Whealy both contacted Awadallah in advance to encourage the entrapment meeting.  The videotape of this meeting, possessed by the Defendants, mysteriously disappeared and was never used in the Italian criminal court (and Awadallah was never given a copy even though he has repeatedly asked for a copy).

39.     In short, the substantial financial and legal resources of WU/FDC were brought down heavily upon Awadallah, in an unreasonable and improper manner, to resolve long-standing civil disputes over: (1) what currency exchange rate should have

been applied to his numerous WU money transfers and what would be appropriate compensation for the admitted irregularities, and (2) how much money Awadallah should be paid for the threats made against him, including the automated, harassing, telephone calls that were made to all of his phone numbers over several months.

40.     Some person or persons at WU and/or FDC determined that the best way to deal with Awadallah was to label him a "criminal" and a "terrorist" and pursue that claim in Italy.  As Degen testified at Awadallah's Italian criminal trial, Schlapbach (Fote and Whealy) decided to use Degen's services (FDC's security specialist) because "I know criminals."   Degen Trial Testimony at p. 30 (English Translation).   Upon information and belief, the "pit bulls" (FDC's American security officers) now were fully engaged and set loose upon Awadallah by Schlapbach and other WU and FDC senior executives (including Fote and Whealy).

### 1.  The Jerusalem Litigation

41.     On or about January 4, 2000, WU filed a *civil* lawsuit against Awadallah in Jerusalem, Israel and was successful, in an *ex parte* manner[5] (by posting a bond), in

---

[5]     WU's own internal notes suggest that Awadallah was never personally served with the paperwork underlying the Jerusalem litigation and that the effort was being engineered by Schlapbach in New York according to his own notes (emphasis added):

> I called David Zailer [WU's attorney in Israel] this morning and he advised that WU was granted an Order in the Israeli Court.  **He indicated that he had just sent David an email outlining exactly what took place and what additional steps need to be taken.** No one appeared on Adnan's behalf.  **The Order prohibits Adnan from having any contact with WU and if he violates it he will be held in contempt of court in Israel.  He told me to notify Adnan of this fact when he calls.**  *He also needs to have him served personally.*  Mr. Zailer also requested $10,000 to cover costs including the private investigator.  I asked to email or fax a statement and he said he would.  Any funds not used would be refunded to WU.

> I called Bob Degen and asked if he would contact David Zeiler in Israel to see if it would be possible for Degen's "guys" to serve Adnan.

secretly obtaining an injunction to freeze all of Awadallah's bank accounts (on January 18, 2000).   His accounts at Israel's four largest banks, Bank Leumi, Bank Hapoalim, Bank Discount and the First International Bank of Israel, were frozen between January 2000 and June 2007.  Again, upon information and belief, Schlapbach engineered this effort from the New York metropolitan area by signing two affidavits at the Israeli Consulate in New York City and, upon further information and belief, Fote and Whealy authorized or ordered this action by Schlapbach.

42.    Before Awadallah even had an opportunity to enlist the services of Jerusalem counsel, his money was frozen and he experienced an inability to pay several people and entities who were owed money.[6]  And, before the restraining order could be extinguished *seven years later*, lawsuits were filed and money judgments were entered against Awadallah.  Incredible damage resulted that remains unabated today.

43.    Among other things, the Israeli lawyer hired by WU/Schlapbach (David Zailer – believed to be the son of the President of the Jerusalem District Court), made outrageous and false allegations about Awadallah, an Arab, to ensure that the Israeli judges would be biased in WU's favor: "[Awadallah is] hiding in Judea and Samaria" and "Awadallah has taken refuge in the territories controlled by the Palestinian Authority." All the while, WU/Schlapbach knew that Awadallah was living in Europe because attorney Schlapbach states this repeatedly in his affidavits filed contemporaneously in the concurrent London litigation (example: "I believe that Awadallah is currently in London

---

[6]    On January 18, 2000, WU allegedly obtained an *ex parte* injunction (the "Israeli Court Order") from the District Court in Jerusalem, directing Awadallah to "refrain from contacting directly or indirectly [WU], its employees, staff, offices, or agents wherever they are, whether by phone, fax, in person or in any other way, and for any purpose, and to refrain from making nuisance, interfere, threaten or damage in any other way, directly or indirectly, the activities of [WU], its employees, staff, officers or agents wherever they are."

-18-

for medical treatment and is staying at the Sheraton Park Tower Hotel in Knightsbridge or the Novotel at Heathrow.").

44.    On or about February 7, 2002, the Jerusalem action was ordered to be closed by an Israeli judge, but WU/FDC did not take any action (and improperly kept the liens on Awadallah's bank accounts).  On June 1, 2007 a court order was issued to cancel the WU restraining order on Awadallah's bank accounts – action taken only after Awadallah begged the then-President of WU, Ms. Christina Gold, to instruct attorney Zailer to release the liens.  However, as stated earlier, the damage had already been done. Awdallah's creditors had, in the interim, obtained a number of judgments against him and against his bank accounts and those judgments caused the Israeli government to bar any attempt by him to return to his homeland.[7]

---

[7]    Awadallah has received a letter from "The State of Israel – The Enforcement and Collection Authority."  This letter advises that Awadallah may not return to his homeland unless and until he pays the outstanding debts now owed to his creditors:

> According to Section 66 A (1) of the Execution Office law of 1967 (hereinafter the "**Law**"), and according to the Execution Office registrar's order, you have been imposed with a restriction concerning your passport.
>
> The restriction does not enable you to obtain/hold/extend your passport, meaning, your passport is invalid and you may not hold a passport or any pass documents for leaving the country.
>
> Section 66 (A) of the Execution Office states:
>
> "Restricting the indebted individual from obtaining an Israeli passport or pass documents according to the passports law of 1952, from holding a passport or a pass document as stated or to extend their expiry dates, provided they shall remain valid for the purpose of returning to Israel. This restriction shall not be imposed if the Execution Office registrar was convinced that the departure from Israel was made on grounds that a family member of the indebted individual depends on him for aid."
>
> **You can lift your restriction by:**

45.     In sum, WU's/Schlapbach's wrongful actions in Jerusalem have caused Awadallah to lose all of his passport privileges and, most importantly, the privilege of returning to his homeland.  This has caused, among other things, great heartache as Awadallah was unable to visit his brother, Joseph Awadallah, before his brother died of cancer on February 7, 2014 (and he was unable to attend Joseph's funeral on February 8).

**2.   The London Litigation**

46.     Like the litigation filed in Jerusalem, WU secretly and simultaneously filed (*ex parte*) litigation in London against Awadallah (and then sought various court orders against him before he was served with any court papers).  Again, upon information and belief, Schlapbach engineered this effort from the New York metropolitan area and, upon further information and belief, Fote and Whealy authorized or ordered this action by Schlapbach.  On January 24, 2000, attorney Schlapbach signed a first affidavit, which was filed in The High Court of Justice, Queens Bench Division, Royal Courts of Justice, Claim No. HQ 0000394.

47.     While the Jerusalem litigation was used to cripple Awadallah financially by freezing his bank accounts, the London litigation was used by WU to cripple his ability to obtain compensation and protection from WU and FDC, by WU obtaining an *ex parte* order of protection.

48.     To this day, Awadallah does not know the full extent of the damage WU/FDC (and Schlapbach, Fote and Whealy) caused to him in the United Kingdom as

---

A. Paying the outstanding debt in full, in files for which the restriction was imposed.
B. Filing an application to the Execution Office registrar pending his decision.

he does not presently have the resources to even inquire as to the status of that 2000 London litigation (or repair the damage done to his reputation and status in that country).

### 3.   The Rome Entrapment & Following Criminal Proceedings

#### a.      Plot Is Hatched to Ensure that Awadallah Is Arrested

49.     While Awadallah was and is not privy to the internal discussions within WU/FDC, a conspiratorial plan was apparently hatched by Schlapbach (Fote and Whealy) and certain other agents and employees within WU and FDC (including Degen and Heavey) in early 2004 to allege, in Italy, that Awadallah was an Arab terrorist who had been extorting money from WU/FDC.[8]   In fact, this false allegation worked exceedingly well in the days that followed the terrorist attacks of September 11, 2001, because prosecutors around the world had begun to believe that: (1) money transfers by an Arab individual were highly suspicious (as they might be made in financial support of global terrorism), and (2) a heated dispute with an Arab individual might lead to violence if not immediately satisfied.

50.     With this backdrop, WU/FDC (Fote and Whealy), their attorneys (Schlapbach, Diego Perugini, *et al.*) and their security personnel (Degen and Heavey), approached Italian police officers and prosecutors and encouraged the latter to assist in ensnaring an Arab individual (Awadallah) who allegedly had been making terrorist threats against WU and FDC (property damage and physical injury) if his financial

---

[8]      As FDC attorney Diego Perugini details in his Intervention Brief (English Translation at p. 4) dated March 21, 2005 (filed with the Italian criminal court): "[A]s the unlawful conduct did not stop, Western Union asked its parent company First Data Corporation, the civil claimant herein, to handle the matter directly ... The massive legal operation undertaken by First Data Corporation ended up only increasing the violence of the unlawful behaviour."   In fact, the massive legal operation undertaken by FDC's security personnel ended up steamrolling an innocent man – FDC's security personnel were paid to silence him and they did.

demands were not met.  Most of the foregoing is confirmed within the "Report of Complaint" (hereinafter "Criminal Complaint") filed with the Italian Carabinieri (Rome) – the Criminal Complaint was signed by Degen and Heavey on March 10, 2004 (an English translation of the Criminal Complaint is annexed hereto as Exhibit D).

51.     The attached Criminal Complaint is based almost entirely on hearsay conveyed by Degen and Heavey -- they state "what other people told them" – and only Degen states that he personally heard Awadallah make a death threat (apparently one such threat, but on an unknown date).  Criminal Complaint, p. 2.  Most significantly, while Degen/Heavey allege in the Criminal Complaint that they were submitting "extracts of the transcriptions concerning the calls made by Awadallah" and "sworn translations made by the persons who received the extortion requests," those items were *never* submitted to the Carabinieri and no recorded telephone conversation with Awadallah, nor any transcript of any such conversation, was ever submitted to the trial court.  *See* Judgment (Exhibit B) at 8.  *Finally, Degen/Heavey never established that the threatening behavior alleged in the Criminal Complaint had any connection whatsoever with Italy other than the March 11 meeting they requested in Rome.*

52.     With a dearth of evidence supporting the extortion charge set forth in the Criminal Complaint, Schlapbach (Fote and Whealy), Degen and Heavey scheduled a staged and videotaped meeting with Awadallah, which they hoped would establish the claimed "extortion" act in Italy.

### b.     The Staged Extortion-Entrapment Meeting in Rome on March 11, 2004

53.     One day after Degen and Heavey secretly signed the extortion Complaint against Awadallah, Heavey asked him to meet her in a room at the Sheraton Hotel in

Rome, Italy.  Also unbeknownst to Awadallah, Schlapbach, Degen and Heavey had hired

a film crew to videotape the entire meeting surreptitiously (with Degen and his film crew

in the next room watching secretly).  Again, upon information and belief, Schlapbach

engineered this effort from the New York metropolitan area with the consent and

authorization of Fote and Whealy.  The videotape of this meeting, promised to Italian

prosecutors by WU/FDC, played the principal role in the warrant issued for Awadallah's

arrest on March 11, 2004:

> Yesterday evening at 8.04 p.m. Kim Catherine Heavey contacted
> Awadallah at his phone number 333/8531324 and told him that she would
> call him the following day to agree the time and place of the meeting.  So
> she booked two rooms in the Sheraton Hotel in Rome, where she could
> hand over the money. *One of the rooms was equipped with a video
> recording system so as to document the meeting and the handover of the
> money...* The two agreed to phone each other later and in the meantime a
> surveillance operation was mounted at the said Hotel Sheraton... After a
> brief talk *and after having recorded the handover of the money* and the
> signing of a declaration whereby Awadallah undertook to cease the
> threatening telephone calls and e-mails to First Data Corporation, its
> workers and their families, at 4.28 p.m. Awadallah was arrested while
> walking along the corridor that led to the hotel elevator.

Arrest Report dated March 11, 2004 (emphasis added).

54.     It is undeniable that the purpose of this March 11, 2004 meeting, as

explained to Awadallah, was to satisfy an agreement reached between Mr. Charles Fote

of FDC and Awadallah previously, and to confirm and arrange a payment of money to

Awadallah under that agreement -- *for harassing and threatening actions FDC had taken

against Awadallah (among other things, automated telephone calls made to Awadallah's

phones)*.  In short, the March 11 meeting was scheduled explicitly to resolve a legitimate,

long-standing economic dispute that Awadallah believed that he had now resolved with

WU/FDC.[9]   The videotape of the March 11 meeting would likely confirm this, if the Defendants would agree to produce it.  Instead, the videotape was and has been secreted and was never entered into evidence in the Italian criminal court.

55.     Schlapbach, Degen, Heavey, Fote and Whealy convinced Italian prosecutors and police officers that money was going to be paid to Awadallah at the Sheraton Hotel meeting *only* because he had made threats against WU/FDC (and its employees) that had *no* legitimate, economic basis (Italian authorities were never advised by the Defendants that Awadallah had a legitimate basis for seeking money from WU/FDC for the latter's wrongful conduct towards him).[10]

---

[9]     Plaintiff did, indeed, speak with Fote on March 11 as Fote telephoned him and strongly encouraged Awadallah to meet with Heavey at the entrapment meeting.  That same day, Whealy called Awadallah and sent him an email: (1) confirming that Fote wanted to resolve his long-outstanding dispute with Awadallah and (2) authorizing the March 11 meeting with Heavey and the payment of money (through a "false check") to Awadallah ("you will not be harmed or arrested if you meet with Kim… who is Mr. Fote's special assistant.").  Fote and Whealy played direct roles in the arranged "entrapment meeting," as Heavey testified at the Italian criminal trial that: (1) she was handed Awadallah's cell phone during the March 11 meeting and she heard Fote screaming at Awadallah at that time, and (2) she claimed that the check delivered to Awadallah at the March 11 meeting was authorized for use by Whealy.  All of the American employees of WU and FDC (Schlapbach, Degen, Heavey, Fote and Whealy) involved in arranging the March 11 meeting knew that the American check delivered to Awadallah at that time was a "false check" -- it was signed by someone (Degen) not authorized to sign FDC checks.  On a different note, Fote's secretary, Betty Lape, sent a letter to Perugini on March 11 attaching documents that had nothing to do with alleged bad conduct by Awadallah in Italy: "This is to notify you that phone calls to First Data Corporation [in the United States] have continued after Adnan Awadallah's arrest today.  I am attaching a copy of a caller id report from our Telecommunications Department that reflects such.  I can be reached at (303) 967-7824 if you need to discuss."  And, finally, just prior to his arrest on March 11, Awadallah exchanged numerous emails and telephone calls with both Fote and Whealy about a sum of money promised to Awadallah for the harassing, automated phone calls that had emanated from an FDC computer.  Clearly, both Fote and Whealy were directly involved, from their offices in the United States, with the Defendants' wrongful pursuit of criminal charges against Plaintiff in Italy.

[10]    The first judge to consider the allegations of WU/FDC properly determined that they were insufficient to constitute extortion in light of Awadallah's fuller explanation as to the business root of the parties' dispute (emphasis added):

    In order to be able to assert that those [criminal] statements are credible and that the accused is guilty of the crime, it is thus necessary to carry out a very rigorous check

56.     Remarkably, the videotape of this staged entrapment meeting disappeared shortly after the Italian criminal court proceedings were begun – a copy was never made available to the trial court or Awadallah by WU or FDC.  It most certainly would show that Awadallah made no threats against WU/FDC and, even more significantly, that he made no assertion of a right that was unaccompanied by a legitimate economic basis (*e.g.*, damages for disturbing his life with computer-generated calls).  By withholding and concealing the videotape, WU/FDC (Schlapbach, Degen, Heavey, Fote and Whealy) concealed exculpatory evidence and had to resort to their own testimony (about conduct occurring outside the borders of Italy) to obtain a criminal conviction.

### c.     The Arrest & Incarceration of Awadallah

57.     Based on the failed entrapment meeting set up by WU's/FDC's attorneys, agents and representatives (Schlapbach, Degen, Heavey, Fote and Whealy) of WU and FDC were compelled to allege only generally that Awadallah was extorting money from

---

aimed at explaining the logical-legal prerequisites that accusatory statements adduced as evidence must fulfil if one is to conclude that those same statements are actually true. In particular, the statements must be concrete, sufficiently detailed and above all exhibit a clear interior logic and a rigid spatial-temporal consequentiality.  In fact, the Supreme Court has unequivocally held that *statements made by an injured party, although originating from a person who is surely classifiable as a person with knowledge of the facts, require greater judicial scrutiny given the likelihood, based on common experience, that those statements could well stem from prior grievances or differences between the parties.*  The full utilisability [sic] of those types of statements for evidentiary purposes, though not conditioned by the indispensable obtaining of internal corroboration, must find its necessary foundation in a demonstration that the statements in question are totally and indisputable true and sincere.

"Order Rejecting Precautionary Measures Following Confirmation of Arrest" issued by Judge Emanuele Cerosimo dated March 14, 2004 at p. 7-8, Preliminary Investigating Judge Docket No. 5610/2004, Criminal Report Docket No. 12194/2004 (English Translation) (emphasis added). *See also* Degen Memorandum "To Whom It May Concern" dated September 6, 2000 ("This is to confirm that First Data Corporation in the person of Charles T. Fote, President and Chief Operating Officer, has agreed to pay Adnan Awadallah, *a Western Union client and customer*, the sum of $120,000.").

-25-

WU/FDC *through telephone calls made to the United States from unknown locations.*
Nevertheless, on the promise that the March 11 videotape would establish criminal conduct on the part of Awadallah, Italian police officers and prosecutors[11] chose to arrest him (and continue to prosecute him even after it was determined that the March 11 videotape would not be placed into evidence). Awadallah was arrested as soon as he left the hotel room where he and Ms. Heavey met on March 11, 2004. He was taken to Regina Coelli Prison in Rome where he remained imprisoned for three days.

58.     On March 14, Awadallah was unconditionally released from jail after a lengthy session with the Preliminary Investigating Judge. On March 17, the Italian prosecutor appealed Awadallah's unconditional release to a three judge appellate panel, which entertained oral argument on the appeal on April 21. In a detailed decision issued on June 21, 2004, Awadallah was ordered to return to Rome (he had been temporarily living in Barcelona, Spain) where he would remain under "house arrest":

> APPLIES, the measure of compulsory residence in Rome against A
> WADALLAH Adnan, ordering him not [to] leave this town without this
> Judge's authorization.

---

[11]     In fact, Awadallah has learned since the events in question that FDC's principal attorney, Diego Perugini, Esq., had a very close and influential friendship with the Italian police officer, Warrant Officer Giuglielmo Occhipinti, who was responsible for monitoring the March 11, 2004 meeting set to trap Awadallah. Occhipinti was otherwise responsible for investigating the merits of the extortion charge against Awadallah. The "deck" apparently was "stacked" against Awadallah from its very outset – the criminal investigation and prosecution were bought and paid for with WU's/FDC's money, influence and connections. Perugini stated in written papers filed with the Italian criminal court that FDC's American General Counsel, Whealy, had authorized him to file an "Intervention Brief" on behalf of Whealy and FDC in support of the criminal charges brought against Awadallah in Italy. *See* "Civil Claimant's Intervention Brief" dated March 23, 2005. And Fote had expressly authorized Whealy to act on his (and FDC's) behalf throughout the Italian criminal proceedings: "This letter is to notify you that Michael T. Whealy is Executive Vice President, General Counsel and Chief Administrative Officer of First Data Corporation. I have authorized Mr. Whealy to have ultimate authority on all legal matters in regard to First Data Corporation and its subsidiaries [in the Italian criminal litigation]." *See* Fote's "To Whom It May Concern" Letter dated April 4, 2004.

STATES that the territorial competent police authority is that indicated by the accused during his examination (Via Barberini 3) where he will have to go, without delay, to declare the place where he has fixed his residence.

ORDERS the accused to state to the police, the times and places where he will be available daily for the required checks, obliging him to inform, in advance, the aforesaid authority, any change of the above mentioned places and times.

Re-Examination of the Measures Restricting Liberty, Court of Rome, No. 789/2004, dated April 21, 2004.

59.     Awadallah appealed the latter "house arrest" order, but his appeal was rejected.   In connection with the latter confinement, uniformed Italian police officers visited Awadallah's temporary Rome residence every evening for months to confirm that he was home – this greatly embarrassed Awadallah in front of his neighbors.

60.     In the ensuing months, WU/FDC employees continued to threaten Awadallah.  For example, on September 27, 2004, Heavey called Awadallah and advised him: "We have bought everybody in Rome, judges and everybody…you have no chance."

61.     The Defendants were apparently disappointed with Awadallah's even limited freedom, so additional, alleged "evidence" was submitted to the criminal court in an effort to convince the Italian prosecutor that Mr. Awdallah should be immediately imprisoned.   More specifically, Heavey sent a letter to Dott. Olga Capasso dated April 27, 2005 complaining that Awadallah had been calling WU/FDC personnel and that he allegedly had called FDC "at least 5,000 times."  In response, the Italian prosecutor filed papers requesting Awadallah's immediate arrest and detention.  An "Order of Detention in Prison" (Italian Arrest Warrant) was issued by the Judge for Preliminary Investigations, Dr. Mariagiulia De Marco on June 6, 2005.

62.     An international arrest warrant was soon issued against Awadallah on July 5, 2005.   The "European Warrant of Arrest," also issued by Investigating Judge De Marco, contains the following misinformation supplied by the agents, servants and representatives of WU/FDC:

> *Circumstances of the offence, when and where it was committed and degree of participation in crime of the present fugitive:*
>
> acting according to his criminal plan, using violence while threatening to ruin good names of First Data Corporation and Western Union, he phoned, sometimes 3000 times a day, the executives of the said companies, also home, threatening to kill them.  He violated the companies' web sites and private sites, in particular that of Charles Fote, the Chairman of the board of directors of First Data Corporation, violating his credit cards site.  He forced the said company directors to pay, in several occasions, the total amount of 400,000 USA dollars to make him give up.  He forced Kim Catherine Heavey and Robert Degen of First Data Corporation to pay him 10,000 USA dollars in cash and a cheque of 118,484 USA dollars, therefore obtaining wrongful benefits by causing serious property damage to the victims.

European Warrant of Arrest dated July 5, 2005 at 2-3 (English Translation).

63.     Again, all of the claims made by WU/FDC in support of the Warrant were untrue and were, ultimately, found to be untrue by the Italian Court of Appeal in the attached Judgment.

64.     Awadallah was ultimately re-arrested in Frankfurt Germany on November 3, 2005.  He was held in a German jail for fifty (50) days before being extradited to Rome, Italy (Rebibbia Prison) on December 22, 2005.

65.     When Awadallah was extradited to Rome, Degen was there to greet him at Rebibbia Prison, *with a photographer*, to document, proudly and gloatingly, that Awadallah was in handcuffs and was being taken to a jail cell.

66.     Awadallah was subsequently held in a Rome jail until February 13, 2006, before being released to an "obligation of abode" a/k/a "house arrest." Awadallah remained under "house arrest" between February 13 and June 6, 2006 under very strict terms. Again, in connection with the latter confinement, uniformed Italian police officers visited Awadallah's temporary Rome residence every evening for months to confirm that he was home.

67.     While awaiting trial (and the results of an eventual appeal), Awadallah was ordered by an Italian judge to remain in Rome until the charges against him were resolved ("the defendant must not leave this municipality without the authorization of the judge having jurisdiction").[12]

### d.      The Preliminary Criminal Pretrial Proceedings

68.     Among other things, WU's/FDC's lawyers filed papers with the criminal court that bolstered the lies and misrepresentations detailed in the Degen/Heavey Criminal Complaint. Again, upon information and belief, Schlapbach engineered this effort from the New York metropolitan area (authorized by Fote and Whealy) with unknown support and/or approval by other WU/FDC John/Jane Does. For example, Italian attorney Diego Perugini filed a letter with the court on March 11 or 12, 2004 claiming that FDC could prove that Awadallah "has electronic equipment able to independently and automatically make calls to First Data Corporation" – up to "two thousand more" – *after* Awadallah was arrested and imprisoned and physically unable to

---

[12]     On July 26, 2006, a police administrative order of expulsion was issued against Awadallah – it compels him to leave Rome. When Awadallah appealed this order, a judge rejected the appeal. At this time, Mr. Awadallah cannot return home to Jerusalem and is subject to being deported from Italy. He may correct the latter problems, but not without a great expenditure of money on attorneys.

make those calls himself from prison.  Perugini suggested that "Awadallah is acting in concert with accomplices whose identities are currently unknown."  These were simply incredible allegations by FDC's counsel -- allegations that were never corroborated and certainly never proven.[13]

69.    Perugini also filed a "Civil Claimant's Intervention Brief" (AA#12) (with a special power of attorney granted by FDC's General Counsel (U.S.A.), Michael T. Whealy) with the court on or about March 21, 2005 that contains only hearsay and no admissible evidence:

> The purpose of this brief is to seek damages for all of the loss caused to the injured party by the unlawful conduct of the accused Adnan Awadallah, who, through a series of actions implementing the same criminal design, using violence while threatening to ruin the good name of the American companies First Data Corporation and Western Union, phoned, sometimes 3,000 times a day, the executives of the said companies, including at their home, threatening to kill them, hacked the companies' websites and private sites, in particular, that of the credit cards of Charles Fote, the Chairman of the Board of Directors of First Data Corporation and forced the said company directors to pay, on several occasions, the total amount of 400,000 US dollars to make the accused give up to the point of forcing Kim Catherine Heavey and Robert Degen of First Data Corporation to pay him 10,000 US dollars in cash and a cheque for 118,484 US dollars, therefore obtaining an undue benefit by causing serious economic loss to the injured parties; from July 1999 to 11 March 2004, in Rome and abroad.

Intervention Brief at 2.

> The Security Division of First Data Corporation installed a complex system aimed at filtering out the calls…But the accused still managed to

---

[13]    The lies and fabrications continued immediately after the entrapment meeting of March 11, 2004 (it is clear that WU/FDC wanted to ensure that Awadallah would be kept in detention indefinitely).  Thus, immediately after his arrest, a letter was dispatched by FDC (from Becky Lape, Executive Assistant to Fote in America) to Perugini, and then he sent it to the court; FDC claimed that Ms. Lape's letter and attached document showed that telephone calls were still being made to FDC by Awadallah after his arrest.  Again, FDC never explained how Awadallah could be linked to the American phone calls while he was incarcerated, but the very fact that FDC's CEO (Fote) submitted documents made the allegation appear true.

circumvent those systems of protection through rare IT skills, organisational ploys (repeated calls originating from computers linked to call centres through prepaid cards with US numbers) and probably the aid of hackers unknown to us.

Intervention Brief at 5.

It is worth adding for the sake of completeness that immediately after Awadallah's arrest First Data Corporation's switchboards were inundated with countless (computer generated) calls such as to paralyse the company's business.

Intervention Brief at 6.

70.    Perugini was not an eyewitness to any alleged wrongful act performed by Awadallah and, yet, Perugini details the alleged criminal acts as if he was present personally when they were performed.  And, Perugini wholly failed to provide even a scintilla of actual evidence to support any of his claims.  Example: no evidence was presented to: (a) link Awadallah to calls being made to WU/FDC executives "3,000 times a day," or (b) link Awadallah to the alleged hacking of "the companies' websites and private sites, in particular, that of the credit cards of Charles Fote," or (c) show that Awadallah had "rare IT skills...and probably [had] the aid of hackers unknown to us," or (d) show that Awadallah had the capability to "inundate" FDC's switchboards "with countless (computer generated) calls such as to paralyze the company's business" after his arrest.

71.    Perugini "banged on an empty barrel" and made a loud, but empty noise; he effectively, but improperly, stated that Awadallah had committed criminal acts (outside Italy), knowing full well that Awadallah was only zealously pursuing a civil claim for money damages for wrongs that WU and FDC admittedly had perpetrated against him and that FDC had no admissible evidence linking Awadallah to the criminal

acts Perugini had described in his Civil Claimant Intervention Brief (3,000 calls allegedly made by Awadallah). As the attorney-in-fact for FDC, FDC is liable for Perugini's wrongful pursuit of the charge asserted against Awadallah. Again, upon information and belief, Schlapbach engineered and paid for this effort from the New York metropolitan area, with the support and/or approval of other senior WU/FDC "John/Jane Does" (including Fote and Whealy).

### e.   The Trial of Awadallah in Rome

72.     The Italian criminal trial commenced on or about January 18, 2006 and ended on or about May 12, 2010. Awadallah was kept in prison at the outset of the trial and was excluded from many of the trial proceedings. His limited English, and inability to speak or understand Italian at that time, also seriously limited his ability to participate in the trial with his assigned counsel.

### f.   The Italian Prosecutor's Relationship with FDC

73.     It is especially noteworthy that FDC's Italian attorney, Diego Perugini, sat next to the Italian Prosecutor (Ms. Olga Cappaso) throughout the trial (offering whispered advice and assistance). It was clear to many present in the courtroom that Perugini was steering the conduct of the trial (this actually caused Awadallah to protest and to be banned from the courtroom by the judge).

### g.   The Testimony of the WU & FDC Witnesses

74.     Significantly, the alleged tape recordings (or transcripts) of Awadallah's threatening phone calls (in English) to the United States (promised in the criminal complaint signed by Degen and Heavey) were never entered into evidence and the videotape of the March 11, 2004 meeting between Heavey and Awadallah disappeared.

All of these items were requested by Awadallah during the trial, but none were produced. *Presumably, these items are in the possession of the Defendants in the United States.* The aggravated extortion charge brought against Awadallah was supported *only* by the bare trial testimony of three WU/FDC American witnesses who travelled to Rome and testified in their native language, English, about telephone calls made to the United States and one staged meeting in Italy (no conduct on the part of Awadallah was attributed to action taken in Italy, except for the March 11, 2004 meeting, and the videotape of the latter event was not used at trial in support of the extortion charge).

### i.      Robert Degen – FDC – Vice President - Security Division

75.     Degen was the first witness to testify at trial.  He admittedly did not have any first-hand knowledge about Awadallah's interactions with WU and FDC executives and staff.  Degen attempted to claim that he was familiar with Awadallah's money transfers with WU made many years earlier (but only starting in 1999, not before).  As a person associated with security at FDC, he was clearly unequipped to testify on Awadallah's money transfers with WU and any early settlement payments made by WU. Degen testified from notes, and his testimony regarding dates, times, and numbers were horrifically wrong.

76.     Degen certainly did not describe *all* of Awadallah's transactions with WU as Awadallah had clearly stated many, many times to attorney Schlapbach and others that he often transferred money through WU in the names of his clients.  Degen testified in complete disregard of this fact (and he limited his testimony to transfers that were made in 1999 and a few years after 1999):

The Judge:  From whom? We want to know the transfers that he made through the Western Union and for which you said that he was a client. Can he tell which are them?

Degen:  I know about the operations between 1999 and 2005 …

The Judge: Which kind of operations, excuse me?

Degen:  The defendant made 99 transfers a year, on the average, for a total of less than 35,000 dollars.

77.     Degen testified that that WU had initiated criminal cases against Awadallah in Germany, Austria, Israel, France and the United States, but he offered no proof on this subject.  If such criminal actions had been instigated by WU/FDC, Awadallah never received any paperwork associated with these actions and he was certainly not called to answer any charges in these countries.

78.     And, as for the alleged protective order that Degen claimed that WU/FDC had obtained against Awadallah in London, Degen admitted that he could not produce it at trial.

79.     Degen also testified that WU had obtained a judgment in Jerusalem ordering Awadallah to return money to WU.  This was also untrue, as no court in Israel ever ordered Awadallah to pay any money to WU.

**ii.     Kim Heavey – FDC – Vice President - Security Division**

80.     Heavey's trial testimony was, in many regards, even more outrageous than that of Degen.  Although she admittedly started her employment at FDC in 2004 (in America) as a security executive, she repeatedly testified about WU/FDC transactions and activities that occurred before she started her employment.

81.     She went on to claim that Awadallah made over 3,000 (computerized) telephone calls a day to officers, directors and employees of FDC in the United States.

-34-

She produced some minimal American paperwork regarding these alleged calls, but none of the paperwork established that Awadallah was the source of the calls to FDC.  She simply had no personal knowledge about anything important, and submitted no evidence of anything approaching extortion on the part of Awadallah.  Interestingly, she testified at the criminal trial that prosecutors in Spain had refused to consider filing criminal charges against Awadallah "because it is a matter between the defendant [Awadallah] and the people in America, and nobody in Spain was involved [in any alleged extortion]."

### iii.    David L. Schlapbach – WU – General Counsel

82.    *More important than what Schlpabach said, was what he didn't say.* Schlapbach testified that Awadallah's demands for money were unreasonable and they had no legal basis – this from a man who years earlier admitted that he had performed an investigation into the currency irregularities brought to his attention by Awadallah, by a man who paid Awadallah significant sums of money based on his personal investigation and WU's admitted failings, and a man who had entered into several legal agreements (governed by New York law) with Awadallah to memorialize a settlement of WU's wrongdoing.  This from an attorney who explicitly stated in a January 25, 2000 sworn affidavit that Awadallah's dispute with WU had an economic basis:

> During July 1999, *Awadallah, a customer of Western Union, contacted Western Union alleging that a discrepancy in Western Union's foreign exchange calculation (the "Discrepancy") had operated to his detriment, by causing certain of his money transfers to be calculated at an inferior exchange rate.  He demanded reimbursement of his damages, claiming that they totaled "hundreds of thousands of dollars."*  Awadallah also threatened to inform the media of the Discrepancy if the money was not paid to him.  Awadallah had transacted business with Western Union for a period of about two years.  To the best of my belief, during that period he conducted business to a total value of less than $1 million.

> 6. *I informed Awadallah that the Discrepancy did not constitute a basis for any claim of reimbursement or compensation since it was Western Union's position that Western Union has the right at all times to set foreign exchange rates in its absolute discretion*, taking into account, inter alia, the relevant market for foreign exchange, currency risk, volume and other factors.

> 7. *Awadallah refused to accept my position*, and continued calling me and other employees at Western Union's Paramus (New Jersey), St. Louis (Missouri) and Paris offices incessantly over the following weeks, (as well as the offices of our agent in London) sometimes calling more than 20 times a day, threatening to go to the media if he did not receive reimbursement for his alleged "losses" ….

Affidavit of David L. Schlapbach dated January 25, 2000 at 2 (filed in the London Litigation described above) (emphasis added). In the same Affidavit, Schlapbach later admitted that *WU had paid money to Awadallah to reimburse him for expenses*:

> 4. Shortly after the agreement was signed, Awadallah again started calling me and other Western Union employees repeatedly. *In these phone calls he requested further sums claiming that he now wanted reimbursement of expenses in bringing the Discrepancy to Western Union's attention and in concluding the First Waiver.* He threatened to contact the media concerning the Discrepancy and threatened to visit the Paris office of Western Union in person….

> 5. In a further attempt to put an end to Awadallah's harassment and threats, on 24 August 1999, a letter agreement was entered into with Awadallah... *Pursuant to the Second Waiver Awadallah was paid, without prejudice, a further $8,000 to reimburse him for expenses he ostensibly incurred in bringing the Discrepancy to Western Union's attention* and in concluding the 13 August 1999 Agreement, in return for adequate evidence of his expenses.

*Id.* at 4 (emphasis added).

83. Attorney Schlapbach had a legal and moral duty to testify completely as to Awadallah's real motivations in his dealings with WU and FDC and the business context in which they arose. Instead, attorney Schlapbach misrepresented the nature of Awadallah's relationship with WU and FDC.

84.     For example, Schlapbach testified falsely, under oath, that Awadallah was making 3,000 telephone calls a day to WU and that he could state "I'm not a technician, but I can say certainly it was Adnan."

85.     Perhaps attorney Schlapbach's most egregious testimony was that a "penal case" was filed against Awadallah in Israel and that an Israeli court had issued an order requiring him to pay money back to WU.  This is especially outrageous coming from: (1) a lawyer, and (2) someone who actively participated in that case – since the case in Israel was not a criminal action and Awadallah was never ordered by any judge in Israel to pay back any money to WU.

> **h.     Awadallah as Claimed "Terrorist" & "Stock Price Manipulator"**

86.     Finally, WU's and FDC's three American witnesses made liberal and improper use of the events of September 11, 2001 and the resulting and developing: (1) prejudice and suspicion that arose against Arab-named people, and (2) downturn in the stock markets -- to suggest that Awadallah was a terrorist who had (a) threatened to duplicate the events of September 11 and (b) damaged the stock of FDC because investors "became suspicious" of Awadallah's alleged threats.  How WU/FDC used these outrageous, suggestive claims is shown below:

87.     Schlapbach testified under oath in criminal court in Rome on November 7, 2007 (emphasis added):

Schlapbach:  He [Awadallah] continued harassing, menacing, threatening in a very scary way.  Remember that this was the Fall of 2001 and **we are a New York based company.**

Prosecutor:  Can you repeat?

Schlapbach:  **It was Autumn 2001 and we are based in New York, and Adnan said to me… If you don't pay me we will do to your company what happened in New York.  If you don't pay me the same thing will happen to you that happened in New York.**

Prosecutor:  So you felt scared by these threats?

Schlapbach:  Yes. Yes.

Prosecutor: And so you paid money to the defendant?

Schlapbach:  On December 5, 2001....

88.     Mr. Schlapbach submitted no corroborating evidence in support of this salacious claim.

89.     In a similar manner, Degen, testified under oath that Awadallah's alleged threats had caused the stock of FDC to decline ten percent ($3 billion dollars)[14]:

Prosecutor:   So, in short, has this [activity on the part of Awadallah] caused a damage to the company's activity, an economic damage I mean?

Degen: During this period, the stock of our company went down ten percent.  Our company is owned by Wall Street; the investors became suspicious and did not invest anymore, our stock went down ten percent – that is three billion dollars.

Prosecutor:  They [share price] went down, didn't they?

Degen: Yes.

Prosecutor:  After the defendant's arrest, the share price, has it changed?

---

[14]     Degen initiated this "fairy tale" in the Italian criminal pretrial proceedings and, apparently, he was so convincing on this point that the Italian prosecutor made it one of her most significant points in opposing Awadallah's release from prison prior to the start of the trial:

It is very evident that it was not so much the death threats but more the economic loss caused by the obstacles placed in the way of the bank's business *with an ensuing fall in its stock market value* that led First Data Corporation's top management to pay off the defendant, weighing the possible further damage that he could cause them against the money that he was asking for.

Submission to the Criminal Court of Rome by Assistant Public Prosecutor Ms. Olga Capasso dated February 6, 2006 at p.2 (emphasis added) (English Translation).

Degen: Yes, after his [Awadallah's] arrest, the stock went up six percent.

90.     Degen, a security officer, did not have the requisite expertise in the stock market and the trading of FDC shares to state this opinion.  In reality, the change in FDC's stock price was based on the overall decline (and eventual recovery) in the stock market due to the terrorist attacks of September 11, 2001, and certainly not to Awadallah's arrest.[15]

91.     These are but two examples of the uncorroborated, baseless hyperbole that the WU and FDC witnesses used to incite the Italian trial judge into finding against Awadallah.

92.     On May 12, 2010, Awadallah was found guilty of the crime of aggravated extortion.  On July 12, 2010, he received his sentence: five years of imprisonment in an Italian jail and a financial fine of 2,000 Euros.

### i.     The Guilty Sentence

93.     The guilty sentence achieved exactly what WU, FDC, Schlabach, Degen, Heavey, Fote and Whealy wanted – at the sentencing, the judge (Giovanna Salvatore) totally disregarded everything that Awadallah stated in support of his defense and accepted all the hearsay and misstatements of the WU/FDC witnesses.  The criminal case concocted by the Defendants somehow wrongfully swayed the criminal judge.

### j.     The Eventual Appeal & Resulting Exoneration

94.     After his conviction and sentencing, Awadallah commenced his appeal. Briefs were filed by his attorneys and the Italian prosecutors and an oral opinion was

---

[15]     Degen's proof was a page from *Forbes* magazine regarding a decline in FDC stock between 2005 and 2006 and then a Yahoo page from 1994 to 2004.  This was the total sum of Degen's scientific and financial knowledge.

issued by the Italian appellate panel on July 4, 2013.  The written Judgment confirming

the oral opinion was issued ninety (90) days later and the ruling became final on

November 17, 2013.

95.     In the appellate Judgment, the court was *very* critical of WU/FDC and its

American employees for instigating the extortion charge and wholly failing to support the

charge with *evidence*:

> It is, however, very significant that, in spite of the long time period in
> which, according to the complainant, Awadallah had used threats against
> one of the most advanced companies in the use of the most modern
> technologies, not only had 7 commercial [settlement] agreements been
> entered into with the defendant, but **no threatening phone call by
> Awadallah had been brought to the attention of the investigators**. **This
> was in spite of the complainants' statements to the effect that the
> alleged injured party had at a certain point even installed a "device"
> that was capable of recognizing that the incoming communications
> had originated from Awadallah, and was therefore in a position to
> record such communications and to acquire unequivocal evidence of
> the threats allegedly used by the defendant.**

*See* Written Judgment (Exhibit B) at 8 (emphasis added).

96.     The appellate Judgment expressly states that WU/FDC (and their

American employees) failed to provide evidence that Awadallah had *no* reasonable, legal

basis for requesting assurances and money from WU/FDC:

> **[T]he fact that the various written contracts previously signed by the
> parties could not rule out the possibility that Awadallah had,
> including in the phone calls preceding the meeting in the Sheraton
> Hotel, asked for compensation for damages (connected with the
> exchange rates applied) that had subsequently arisen and were not
> reasonably foreseeable at the time of the last settlement.  In fact, in
> each of the written contracts the parties made constant reference to
> the "damages" that Awadallah (defined as Western Union's
> "customer") complained of regarding the exchange rates applied by
> Western Union, and to the intention of the parties to put an end, with
> the performance of those same contracts, to any dispute that could
> originate from Awadallah's claims. Moreover, the absence of video-
> phonographic documentation of the "monitored handover" on**

> **11.3.2004 does not leave scope for any other interpretation of the reasons for the meeting in the Sheraton Hotel room.  More precisely, it does not make it possible to rule out that the meeting also took place in the context of a business relationship, and to state that the true purpose of the meeting was to fulfill a promise intended to bring an end to the insistent repetition of telephone calls from the defendant.**
>
> This last consideration leads us to examine a further element, on which **reliable evidence against the defendant is again totally lacking**.  In fact, **the presence of the above-mentioned contracts made it credible that a "demand" by the defendant that would be reasonably actionable in court existed.**

*See* Written Judgment (filed August 2, 2013 and transmitted to Awadallah on September 23, 2013) (Exhibit B) at 8 (emphasis added).[16]

97.    As stated above, the Italian Court of Appeals specifically found that Awadallah should be acquitted "in the broadest terms conceivable" because WU/FDC (among others, Schlapbach, Degen and Heavey) had submitted "no reliable evidence at all" of extortion (which can only be shown by "a demand not accompanied by a reasonable intent to assert an actionable claim in court").    The Court of Appeals concluded that Awadallah should be acquitted "of the [extortion] charge ascribed to him *on the grounds that the offences never actually occurred*" (emphasis added).  Written Judgment (Exhibit B) at 10.

---

[16]    Under Italian law, Awadallah's exoneration became "final" on November 17, 2013, when Italian prosecutors failed to appeal the aforementioned appellate decision filed on August 2, 2013. *See* English translation of "Court Abstract" for Judgment 6084/13 confirming that the "Judgment is final on 17/11/2013" (Exhibit C hereto).

## LEGAL CLAIMS

## STATE LAW CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### AGAINST THE DEFENDANTS FOR MALICIOUS PROSECUTION

98.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 97, inclusive, with the same force and effect as if set forth at length herein.

99.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy conspired and initiated judicial proceedings against Plaintiff intentionally and without the right to do so.

100.    A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others.  Here, Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy conspired with each other to perpetrate a wrong against Plaintiff.[17]

101.    Defendants WU, FDC, Schlapbach, Degen and Heavey did not have probable cause for believing that a crime (or tort or breach of contract) had been committed and/or that Plaintiff had committed one.

102.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy, collectively and independently, did not act as reasonably prudent persons in initiating criminal (and certain civil) proceedings against Plaintiff.

---

[17]    CPLR 302(a)(2) permits the exercise of jurisdiction over an out-of-state defendant who commits a tortious act within New York either in person or through an agent.  Courts have defined "agent" broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators.  *Grove Press, Inc. v. Angleton,* 649 F. 2d 121, 122 (2d Cir. 1981).

103.    Following the initiation of judicial proceedings against Plaintiff, Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy maliciously continued to use these judicial proceedings to harm and detain Plaintiff, without probable cause, by intentionally fabricating evidence and/or failing to submit any admissible evidence in support of their claims and/or withholding exculpatory evidence.

104.    Defendants WU and FDC are liable for the wrongful acts and omissions of their servants, agents and/or representatives under the doctrine of *respondeat superior*.

105.    As a direct and proximate result of the malicious prosecution by one or more of the aforementioned Defendants, Plaintiff was forced to endure false charges, a false arrest, criminal and civil proceedings, and a wrongful imprisonment.  During all of these events, Plaintiff endured substantial physical, emotional and pecuniary injuries.

106.    Accordingly, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling Fifty Million Dollars ($50,000,000.00), punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**AGAINST THE DEFENDANTS**
**FOR FALSE ARREST/ FALSE IMPRISONMENT**

107.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 106, inclusive, with the same force and effect as if set forth at length herein.

108.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy intentionally caused Plaintiff to be arrested and confined without the right to do so.

109.    A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others.  Here, Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy conspired with each other to perpetrate a wrong against Plaintiff.

110.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy did not have probable cause for believing that a crime had been committed (or a breach of contract or tort) and/or that Plaintiff had committed one.

111.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy did not act as reasonably prudent persons in effecting the criminal and civil charges, and the arrest and confinement of Plaintiff.

112.    Plaintiff did not consent to the arrest and confinement caused by the Defendants.

113.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy are liable for the wrongful acts and omissions of their servants, agents and/or representatives under the doctrine of *respondeat superior*.

114.    As a direct and proximate result of the false arrest and false imprisonment by one or all of the Defendants, Plaintiff was forced to endure a wrongful arrest, unlawful proceedings and a wrongful imprisonment.  During all of these events, Plaintiff endured substantial physical, emotional and pecuniary injuries.

115.    Accordingly, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling

Fifty Million Dollars ($50,000,000.00), punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

**THIRD CAUSE OF ACTION**
**AGAINST THE DEFENDANTS FOR ABUSE OF PROCESS**

116.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 115, inclusive, with the same force and effect as if set forth at length herein.

117.   A malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

118.   A conspiracy is alleged for the purpose of showing that a wrong was committed jointly by the conspirators and that, because of their common purpose and interest, the acts of one may be imputed to the others.  Here, Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy conspired with each other to perpetrate a wrong against Plaintiff.

119.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy employed regularly issued legal process (in Italy, Israel and Great Britain) to compel performance or forbearance of some act by Plaintiff (to silence him and prevent him from initiating a civil litigation and/or disclosing improper corporate acts to the press).

120.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy intended to do harm to Plaintiff without excuse or justification.

121.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy intended to obtain a collateral objective that is outside the legitimate ends of the process

-45-

(to silence Plaintiff and prevent him from initiating a civil litigation and/or disclosing improper corporate acts to the press).

122.    Defendants WU and FDC are liable for the wrongful acts and omissions of their servants, agents and/or representatives under the doctrine of *respondeat superior*.

123.    As a direct and proximate result of the abuse of process by one or all of the Defendants, Plaintiff was forced to endure a wrongful arrest, unlawful proceedings and a wrongful imprisonment.  During all of these events, Plaintiff endured substantial physical, emotional and pecuniary injuries.

124.    Accordingly, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling Fifty Million Dollars ($50,000,000.00), punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

## FOURTH CAUSE OF ACTION
## <u>AGAINST THE DEFENDANTS FOR DEFAMATION</u>

125.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 124, inclusive, with the same force and effect as if set forth at length herein.

126.    The elements of a defamation claim are: (a) a false statement, (b) published to a third party without privilege or authorization, (c) with fault amounting to at least negligence, and (d) that caused special harm or defamation *per se*.

127.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy continuously called Plaintiff an "extortionist" and stated that he was a member of various well known terrorist organizations (including Hamas and Hezbollah).

128.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy knew or should have known that the aforementioned statements were false.

129.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy published the aforementioned false statements to third-parties (including Italian prosecutors and police) without privilege or authorization.

130.   Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy made the aforementioned false statements to hurt or harm Plaintiff.

131.   New York recognizes certain statements as defamatory *per se*, meaning they are actionable without "pleading and proof of special damages."  A statement which tends to disparage a person in the way of his office, profession or trade is defamatory *per se* and does not require proof of special damages.  Stated another way, words are defamatory *per se* if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof.

132.   The aforementioned statements made by Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy undeniably constitute defamation *per se* and, therefore, entitle Plaintiff to money damages due to the significant harm they have caused to Plaintiff's reputation.

133.   Defendants WU and FDC are liable for the wrongful acts and omissions of their servants, agents and/or representatives under the doctrine of *respondeat superior*.

134.   For the defamatory statements made by the Defendants, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling Fifty Million Dollars ($50,000,000.00),

punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS**
**FOR INFLICTION OF EMOTIONAL DISTRESS**

135.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 134, inclusive, with the same force and effect as if set forth at length herein.

136.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy intentionally fabricated false evidence and knowingly, recklessly or negligently withheld exculpatory evidence when they had an absolute duty to produce it and bring it promptly to the attention of the court and defense counsel to hurt Plaintiff.

137.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy did these outrageous, unethical and improper acts, thereby subjecting the innocent Plaintiff to false criminal charges and the suffering that a conviction would create.

138.    Defendants WU and FDC are liable for the wrongful acts and omissions of their servants, agents and/or representatives under the doctrine of *respondeat superior*.

139.    As a direct and proximate result of the above-described outrageous conduct by one or all of the Defendants, Plaintiff was forced to endure false criminal charges, a wrongful arrest, unlawful criminal proceedings (and civil proceedings) and a wrongful imprisonment.   During all of these events, Plaintiff endured substantial physical, emotional and pecuniary injuries detailed above.

140.    Accordingly, Plaintiffs now demand judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling

Fifty Million Dollars ($50,000,000.00) for the wrongful infliction of emotional distress by these Defendants, along with punitive damages, attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS FOR *PRIMA FACIE* TORT**

141.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in this Complaint in paragraphs 1 through 140, inclusive, with the same force and effect as if set forth at length herein.

142.    The requisite elements for a cause of action sounding in *prima facie* tort include (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an act or series of acts which are otherwise legal.

143.    *Prima facie* tort liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

144.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy intended to inflict harm upon Plaintiff and their actions in this regard resulted in special damages to Plaintiff.  Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation.

145.    No excuse or justification existed for the aforementioned wrongful actions, even though these acts might otherwise be deemed legal.

146.    Thus, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling Fifty Million Dollars ($50,000,000.00), punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

**FEDERAL LAW CAUSE OF ACTION**

**SEVENTH CAUSE OF ACTION**
**AGAINST DEFENDANTS**
**UNDER THE TORTURE VICTIM PROTECTION ACT OF 1991**

147.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 146, inclusive, with the same force and effect as if set forth at length herein.

148.    Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy are liable to Plaintiff under the Torture Victim Protection Act of 1991 ("TVPA"), 106 Stat. 73, note following 28 U.S.C. § 1350.

149.    Congress created civil liability in the TVPA, *inter alia*, for torture and extrajudicial killing carried out by an individual with "actual or apparent authority, or color of law, of *any foreign nation*."  TVPA § 2(a) (emphasis supplied).  Although this language could conceivably refer to conduct occurring within the United States, the provision is more naturally understood to address primarily conduct occurring in the territory of foreign sovereigns. The legislative history of the TVPA unambiguously supports that conclusion. *See* S. Rep. No. 102–249, p. 3-4 (1991) ("A state that practices torture and summary execution is not one that adheres to the rule of law. Consequently, the Torture Victim Protection Act (TVPA) is designed to respond to this situation by providing a civil cause of action in U.S. courts for torture committed abroad.").

150.    It is up to a trier of fact (here, a United States jury) to determine whether the Defendants' conduct constituted "torture" under the TVPA.[18]   The TVPA defines torture as:

_____

[18]     One researcher, who carried out psychiatric assessments of eighteen men who had been wrongfully convicted, determined that most of the men suffered from enduring personality

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA § 3(b)(1).

151.    While torture [under this definition] does not automatically result whenever individuals in official custody are subjected even to direct physical assault, a trier of fact must determine whether the false imprisonment suffered by Awadallah did, indeed, rise to a level of "torture" under the TVPA.

152.    Additionally, the TVPA contemplates the "purposes" for which torture might be undertaken by the perpetrator, and specifically lists "intimidating or coercing" the victim among them.  TVPA § 3(b)(1).  Here, WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy subjected Awadallah to false criminal charges and a wrongful arrest and imprisonment for the distinct purpose of coercing him to relinquish his right to pursue civil litigation against them (and to prevent his disclosure of wrongful corporate action to the press).

153.    For a claim of torture to be actionable under the TVPA, a plaintiff must demonstrate, *inter alia*, that a defendant acted "under actual or apparent authority, or color of law, of any foreign nation."  TVPA § 2(a).  To determine whether a defendant acted under color of foreign law, the court will look to principles of agency law and to

---

change, post-traumatic stress disorder (PTSD), depressive disorders and other forms of psychological and physical suffering.  *See* Adrian Grounds, "Psychological Consequences of Wrongful Conviction & Imprisonment. *Canadian Journal of Criminology and Criminal Justice.* 46(2): 165-119 (2004).

jurisprudence under 42 U.S.C. § 1983.   Under those principles, for purposes of the TVPA, an individual acts under color of law when he acts together with state officials or with significant state aid.  WU and FDC, both conspired with state authorities in Rome to obtain the arrest and imprisonment of Awadallah, and clearly acted under color of law within the meaning of the TVPA.

154.    Agency law, however, does not simply apply to the question whether a defendant acts under color of law; it also can provide a theory of tort liability if a defendant did not personally torture the victim.  As the Supreme Court recently explained in *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012), "Congress is understood to legislate against a background of common-law adjudicatory principles," *id.* at 1709 (quotation marks omitted), and therefore "the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing," *id.* (citing *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009)).

155.    In sum, the TVPA reaches those who ordered, abetted, or assisted in the wrongful act").  Accordingly, an individual can be liable for "subject[ing]" the victim to torture even if his agent administers the torture.  *See* TVPA § 2(a)(1).

156.    Here, Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy are clearly subject to liability under the TVPA for bringing a criminal complaint against Awadallah (and resulting "torture") that, in the words of an Italian appellate court, was wholly without merit.  Written Judgment (Exhibit B) at 10.

157.    Thus, Plaintiff now demands judgment against Defendants WU, FDC, Schlapbach, Degen, Heavey, Fote and Whealy for compensatory damages totaling Fifty

Million Dollars ($50,000,000.00), punitive damages, plus attorneys' fees, costs, expenses, and any other and further relief this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues.

WHEREFORE, Plaintiff demands JUDGMENT against each of the Defendants, jointly and severally, as follows:

I.     For compensatory damages in the amount of Fifty Million Dollars ($50,000,000.00) on each of the aforementioned causes of action;

II.    For punitive damages in the amount of Fifty Million Dollars ($50,000,000.00) on each of the aforementioned causes of action;

III.   For reasonable attorneys' fees, together with costs and disbursements of this action;

IV.    For pre-judgment interest and post-judgment interest, as allowed by law; and

V.     For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       September 17, 2014

                                        Respectfully submitted,
                                        Law Office of John F. Schutty, P.C.
                                        Attorneys for Plaintiff


                                        By:_____/s_____
                                             John F. Schutty
                                             (JS 2173)
                                        445 Park Avenue, 9th Floor
                                        New York, NY 10022
                                        (212) 836-4796

**Certificate of Service**

I hereby certify that on September 17, 2014, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants (and other attorneys at these law firms, who are participating in the electronic filings made in this action):

Robert D. Owen, Esq.
Sutherland Asbill & Brennan LLP
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, NY 10036-7703
robert.owen@sutherland.com

Andrew P. Fishkin, Esq.
Fishkin Lucks LLP
The Legal Center
One Riverfront Plaza, Suite 220
Newark, New Jersey 07102
afishkin@fishkinlucks.com

By:_____/s_____
        John F. Schutty
Attorney for Plaintiff
445 Park Avenue, 9th Floor
New York, NY 10022